IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONCORDE EQUITY II, LLC, a Delaware limited liability company;<br><br>          Plaintiff,<br><br>     vs.<br><br>KENNETH ALFRED MILLER, an individual;  GEORGE CRESSON, an individual; LOANVEST XIII, L.P., a California Limited Partnership; SENTINEL INVESTMENT MANAGEMENT COMPANY, a California Corporation; SOUTH BAY REAL ESTATE COMMERCE GROUP, LLC, a California Limited Liability Company; PETER SCOTT CARTER, Jr., an individual; and OLD REPUBLIC TITLE COMPANY, a Vermont corporation,<br><br>     Defendants. | Case No. 10-1041 SC<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO <u>DISMISS</u> |

## I.   <u>INTRODUCTION</u>

Now before the Court are two motions to dismiss.  Defendants Kenneth Alfred Miller ("Miller") and Sentinel Investment Management Company ("Sentinel") (collectively, the "Miller Defendants") filed a Motion to Dismiss.  ECF No. 36 ("Miller MTD").  Plaintiff Concorde Equity II, LLC, ("Plaintiff") filed an Opposition, and the Miller Defendants submitted a Reply.  ECF Nos. 41 ("Opp'n to Miller MTD"), 46 ("Miller Reply").  Defendants Loanvest XIII, L.P. ("Loanvest"), South Bay Real Estate Commerce Group ("South Bay"), Peter Scott Carter, Jr. ("Carter"), and George Cresson ("Cresson")

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

(collectively, the "Loanvest Defendants") filed a Motion to Dismiss.  ECF No. 40 ("Loanvest MTD").  Plaintiff filed an Opposition, and the Loanvest Defendants submitted a Reply.  ECF Nos. 48 ("Opp'n to Loanvest MTD"), 51 ("Loanvest Reply").  For the reasons stated herein, the Court GRANTS IN PART and DENIES IN PART the Miller MTD, and the Court GRANTS IN PART and DENIES IN PART the Loanvest MTD.

## II.   BACKGROUND

The following allegations are taken from Plaintiff's Second Amended Complaint ("SAC").  ECF No. 34.  Plaintiff is a technology investment company.  Id. ¶ 3.  This case focuses on two loan transactions that Plaintiff refers to as "the Bretz Transaction," and "the Roem Transaction."  Id. ¶¶ 17, 22.[1]

In the Bretz transaction, Plaintiff loaned $270,000 to non-party borrowers on or around May 5, 2009.  Id. ¶¶ 17-18, 60.  The Miller Defendants acted as real estate brokers for Plaintiff in the Bretz transaction.  Id. ¶ 18.  Plaintiff alleges that the Miller Defendants failed to adequately investigate the collateral used to secure the loan, and that they falsely represented they had incurred $15,000 in underwriting and legal expenses.  Id. ¶ 45.  The borrowers in the Bretz transaction made a single loan payment to Plaintiff, never made any further payments, and defaulted on the loan.  Id. ¶ 20.  Plaintiff has been unable to recover the principal amount of the loan.  Id. ¶ 21.

---

[1] It is not clear to the Court why the first transaction is labeled "the Bretz Transaction."  The second transaction is called the "the Roem Transaction" because Plaintiff's money was used to fund a loan to Roem Builders and/or Roem Development Company.  SAC ¶ 22.

In the Roem transaction, Plaintiff alleges that it wired $930,000 into an Old Republic Title Company ("Old Republic") escrow account, and that the Miller Defendants and the Loanvest Defendants took the money out of escrow and used it to fund a loan from Loanvest to Roem Builders and/or Roem Development Company ("Roem"), but that the Miller Defendants and the Loanvest Defendants have not lived up to their representations to Plaintiff concerning its interest or involvement in this loan to Roem.  Id. ¶¶ 22-42.

More specifically, Plaintiff alleges that between September and November 2009, Miller and Cresson had discussions with Rob Fitzgerald ("Fitzgerald"), Plaintiff's managing partner, and they represented that Plaintiff would be entitled to a return of seventeen percent of its investment, as well as three points for loan origination fees and one point on the total loan amount.  Id. ¶¶ 23, 27, 31.  Both Miller and Cresson represented that Cresson and possibly members of Cresson's family would be participating pro rata with Plaintiff in the Roem loan.  Id. ¶ 24.  On September 16, 2009, Fitzgerald travelled to California to meet with Miller and principals of Roem.  Id. ¶ 25.

On October 7, 2009, Miller forwarded Fitzgerald an email containing documents that would form the basis of the Roem loan, including a promissory note, deed of trust, and stock pledge agreements.  Id. ¶ 26.  On October 19, 2009, Miller represented in writing to Plaintiff that "you will go direct on title for your pro-rata percentage of the loan by way of an assignment at close. You will be direct on title, with title insurance, when the loan closes."  Id. ¶ 27.  On or about October 21, 2009, Plaintiff wired

**United States District Court**
For the Northern District of California

$930,000 into an Old Republic escrow account, with the intent that it would represent one-fourth of the total Roem loan.  Id.   ¶ 29.

On November 10, 2009, Cresson advised Fitzgerald that the first disbursement of the Roem loan was being reduced from $4 million to $2 million.  Id. ¶¶ 30-31.  In response, Fitzgerald wrote to Cresson, on November 11, 2009, confirming their discussions regarding points, interest, collateral, and amounts. Id. ¶ 32.  Fitzgerald sought to have Plaintiff's participation in the loan cut in half, and asked for the return of $460,000.  Id. Cresson did not respond to Fitzgerald's email, and Fitzgerald wrote to Miller on November 13, 2009.  Id. ¶ 33.  On November 14, 2009, Fitzgerald wrote to both Miller and Cresson demanding the immediate return of Plaintiff's money.  Id. ¶ 35.

On November 14, 2009, Miller called Fitzgerald to express concern about Fitzgerald's request for the money to be returned. Id. ¶ 36.  On November 16, 2009, Miller informed Fitzgerald that Plaintiff's money was removed from the escrow account without Fitzgerald's permission, and that the money was used to fund the loan from Loanvest to Roem, which closed on November 13, 2009.  Id. ¶¶ 37-42.  Carter signed the loan documentation, as manager of South Bay, and as Managing General Partner of Loanvest.  Id. ¶ 34. Plaintiff alleges that Carter and South Bay participated in, and took steps in furtherance of, removing Plaintiff's money from the escrow account without Fitzgerald's permission.  Id. ¶ 38.  Miller told Fitzgerald that Plaintiff did not have any interest in the Roem loan, was not secured in any way, and was not going to be direct on title, with title insurance.  Id. ¶ 40.  Miller told

4

1  Fitzgerald, "Let's pretend it was a personal loan to me."  Id.

2  ¶ 37.

3       Plaintiff commenced this action in state court, and the case

4  was removed to federal court on March 11, 2010.  See Docket No. 1

5  ("Notice of Removal").  In the SAC, Plaintiff asserts fifteen

6  causes of action against the Miller Defendants, the Loanvest

7  Defendants, and the Old Republic Title Company, including fraud,

8  negligent misrepresentation, violations of the Racketeer Influenced

9  and Corrupt Organization Act ("RICO"), and breach of contract.  SAC

10 ¶¶ 43-135.  The Miller Defendants and the Loanvest Defendants move

11 to dismiss Plaintiff's SAC.

12

13 **III.  LEGAL STANDARD**

14      A motion to dismiss under Federal Rule of Civil Procedure

15 12(b)(6) "tests the legal sufficiency of a claim."  Navarro v.

16 Block, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal can be based

17 on the lack of a cognizable legal theory or the absence of

18 sufficient facts alleged under a cognizable legal theory.

19 Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

20 1990).  Allegations of material fact are taken as true and

21 construed in the light most favorable to the nonmoving party.

22 Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 337-38 (9th Cir.

23 1996).  "[T]he tenet that a court must accept as true all of the

24 allegations contained in a complaint is inapplicable to legal

25 conclusions.  Threadbare recitals of the elements of a cause of

26 action, supported by mere conclusory statements, do not suffice."

27 Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atl.

28 Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "When there are well-

pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." <u>Iqbal</u>, 129 S.Ct. at 1950.  A motion to dismiss should be granted if the plaintiff fails to proffer "enough facts to . . . nudge[] their claims across the line from conceivable to plausible." <u>Twombly</u>, 550 U.S. at 570.

**IV.   <u>DISCUSSION</u>**

   **A.   <u>Fraud</u>**

   Plaintiff accuses Miller, Sentinel, Cresson, Loanvest, Carter, and South Bay of fraud.  SAC ¶¶ 43-55.  In California, the elements of fraud are: (a) a misrepresentation by the defendant to the plaintiff; (b) the defendant's knowledge of its falsity; (c) the defendant's intent to defraud; (d) the plaintiff's justifiable reliance; and (e) the plaintiff's resulting damage.  <u>Lazar v. Super. Ct.</u>, 12 Cal. 4th 631, 638 (1996).  Plaintiff "must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b).  Plaintiff must include "the who, what, when, where, and how" of the fraud.  <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1106 (9th Cir. 2003) (citations omitted).  "The plaintiff must set forth what is false or misleading about a statement, and why it is false." <u>In re GlenFed, Inc. Sec. Litig.</u>, 42 F.3d 1541, 1548 (9th Cir. 1994).  While there is no requirement that the complaint identify false statements made by each and every defendant, the plaintiff must identify the role of each defendant in the alleged fraudulent scheme.  <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 764-65 (9th Cir. 2007).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The Court finds that Plaintiff's SAC alleges a plausible fraud claim against the Miller Defendants.  With regard to the Bretz transaction, the SAC alleges that Miller and Sentinel acted as real estate brokers for Plaintiff in the transaction.  SAC ¶ 18.  Miller is the sole owner of Sentinel.  Id. ¶ 5.  Plaintiff alleges that they misrepresented that they adequately investigated the collateral used to secure Plaintiff's loan, and they misrepresented that they incurred $15,000 in underwriting and legal expenses.  Id. ¶¶ 45-46.  Plaintiff alleges the misrepresentations were made to induce Plaintiff to lend $270,000 to non-party borrowers, who subsequently defaulted on the loans.  SAC ¶¶ 20, 46, 60.  Whether there is evidence to support these allegations is another matter, but the allegations are sufficient to survive a motion to dismiss.

With regard to the Roem transaction, Plaintiff alleges that it wired $930,000 into an escrow account based on misrepresentations by Miller, including that Plaintiff would be entitled to a return of seventeen percent on the investment.  Id. ¶¶ 27, 29, 47, 48. After the money was removed from escrow without Plaintiff's permission, Miller told Plaintiff's managing partner that Plaintiff had no interest in the loan from Loanvest to Roem, and Miller stated "Let's pretend it was a personal loan to me."  Id. ¶¶ 37, 40.  The allegations in the SAC state with particularity the circumstances constituting the alleged fraud, and they are sufficient to state plausible fraud claims against Miller and Sentinel with regard to the Roem transaction.

The SAC does not allege that the Loanvest Defendants were involved in the Bretz transaction.  As such, the Loanvest

7

United States District Court
For the Northern District of California

1  Defendants cannot be held liable for fraud related to the Bretz

2  transaction.

3       However, the SAC does allege a plausible fraud claim against

4  the Loanvest Defendants with respect to the Roem transaction.

5  Plaintiff alleges that Carter is the owner and operator of South

6  Bay, and the managing general partner of Loanvest.  Id. ¶ 10.

7  Plaintiff alleges that Miller and Cresson are the alter egos of

8  Loanvest, the entity that loaned money to Roem.  Id. ¶ 11, 22.

9  Plaintiff alleges that it wired $930,000 into an escrow account

10  based on misrepresentations by Cresson, including that Plaintiff

11  would be entitled to a return of seventeen percent on the

12  investment.  Id. ¶¶ 23, 24, 26, 29, 47, 49.  It is alleged that

13  Carter and South Bay participated in removing Plaintiff's money

14  from the escrow account without Plaintiff's permission.  Id. ¶ 38,

15  54.  These allegations state with particularity the circumstances

16  constituting fraud, and they identify the role of each of the

17  Loanvest Defendants in the alleged fraudulent scheme.

18       The Loanvest Defendants contend that Plaintiff could not have

19  relied on any representations by Cresson when wiring the $930,000

20  into the escrow account because Cresson's representations

21  concerning his family's participation in the Roem loan were not

22  material misrepresentations, and Cresson's November 10 email

23  confirming Plaintiff's participation in the Roem loan occurred

24  after Plaintiff had already wired the money.  Loanvest MTD at 4-5.

25  However, the SAC alleges that "[d]uring the course of many

26  telephone conversations [between September and November 2009],

27  CRESSON and MILLER represented to Fitzgerald that CONCORDE EQUITY

28  II's participation in the ROEM LOAN would entitle it to a return of

**United States District Court**
For the Northern District of California

1  seventeen percent on the contributed money, as well as three points

2  for loan origination fees plus one point on the total loan amount."

3  SAC ¶ 23.   Construing this allegation in the light most favorable

4  to the nonmoving party, the Court infers that at least some of

5  these telephone conversations between Cresson and Fitzgerald

6  occurred before the money was wired into escrow and that Fitzgerald

7  relied on these conversations when wiring the money.

8       Without knowing more about the nature of the Roem loan, it is

9  too early for the Court to determine whether Cresson's alleged

10  representations concerning his family's participation in the Roem

11  loan were or were not material misrepresentations.   Plaintiff's SAC

12  focuses on Cresson's representation that Plaintiff would receive a

13  return of seventeen percent, as well as points for participation in

14  the Roem loan, id. ¶ 49, and Plaintiff alleges he relied on these

15  representations when he wired the money into the escrow account,

16  id. ¶ 51.   These allegations are sufficient to state a fraud claim

17  against Cresson, and Plaintiff's allegations that Carter and South

18  Bay participated in removing the money from the escrow account are

19  sufficient to identify their role in the alleged fraudulent scheme.

20  Whether there is evidence to support these allegations is a

21  question for another day, but they are sufficient to survive a

22  motion to dismiss.   The Court DENIES the Loanvest Defendants'

23  motion to dismiss Plaintiff's first cause of action.

24       B.   **Negligent Misrepresentation**

25       Plaintiff's second cause of action asserts a claim for

26  negligent misrepresentation against Miller, Cresson, Loanvest and

27  Sentinel.   The elements of negligent misrepresentation are: (1)

28  misrepresentation of a past or existing material fact, (2) without

**United States District Court**
For the Northern District of California

reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the misrepresentation, (4) ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed, and (5) resulting damage. <u>Glenn K. Jackson Inc. v. Roe</u>, 273 F.3d 1192, 1200 n.2 (9th Cir. 2001).

The SAC alleges that Miller and Cresson are the alter egos of Loanvest, and the SAC also alleges that Miller is the sole owner of Sentinel. SAC ¶¶ 5, 11. The SAC alleges misrepresentations by Miller and Sentinel with respect to the Bretz transaction. <u>Id.</u> ¶¶ 18-19. Plaintiff claims to have suffered losses as a result of its reliance on Miller and Sentinel's representations concerning the collateral used to secure the loan in the Bretz transaction. <u>Id.</u> ¶¶ 19-20, 60. As explained above, the SAC also contains numerous allegations that Miller and Cresson misrepresented the terms of Plaintiff's participation in the Roem transaction, and that Plaintiff relied on these misrepresentations when wiring $930,000 into the escrow account. <u>See id.</u> ¶¶ 22-42. Plaintiff alleges it was deprived of its expected participatory interest in the Roem loan, despite the use of its money, and despite Miller's and Cresson's representations to the contrary. <u>Id.</u> These factual allegations are sufficient to lend plausibility to Plaintiff's claim for negligent misrepresentation against Miller, Cresson, Loanvest and Sentinel. The Court DENIES the requests to dismiss Plaintiff's second cause of action filed by the Miller Defendants and the Loanvest Defendants.

## C. <u>Violation of RICO</u>

Plaintiff's third cause of action alleges that Miller, Cresson, South Bay and Carter violated RICO. The four elements of

**United States District Court**
For the Northern District of California

a RICO violation are: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.    Jarvis v. Regan, 833 F.2d 149, 151 (9th Cir. 1987).

Here, Plaintiff fails to allege a pattern of racketeering activity.    There can be no pattern of racketeering under RICO absent the perpetration of at least two predicate acts of racketeering activity within a ten-year period.    H.J. Inc. v. Northwestern Bell Tel Co., 492 U.S. 229, 232 (1989).    While allegations of two or more predicate acts are a necessary condition to the establishment of a pattern, they are not sufficient; "it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity."    H.J. Inc., 492 U.S. at 240 (emphasis in original).

This continuity requirement may be satisfied by proof of either "closed-ended" or "open-ended" continuity.    Id. at. 241. Closed-ended continuity involves "a closed period of repeated conduct," while open-ended continuity involves "past conduct that by its nature projects into the future with a threat of repetition."    Id.    For open-ended continuity, "[t]he circumstances of the case . . . must suggest that the predicate acts are indicative of a threat of continuing activity."    Medallion Television Enters. v. SelecTV of Cal., 833 F.2d 1360, 1363 (9th Cir. 1987).

Here, the predicate acts are "the acts in furtherance of the fraud in the Bretz Transaction and the acts in furtherance of the fraud in the ROEM Transaction."    SAC ¶ 68.    The SAC does not allege that the Loanvest Defendants had any involvement in the Bretz transaction.    The allegations in the SAC against the Loanvest

**United States District Court**
For the Northern District of California

1  Defendants are limited to the Roem transaction.  As such, the SAC

2  does not even allege two predicate acts against the Loanvest

3  Defendants.  The Court GRANTS the Loanvest Defendants' motion to

4  dismiss the RICO claim against them.

5      With regard to the Miller Defendants, although the SAC alleges

6  their involvement in both the Bretz and Roem transactions, there is

7  no indication of a threat of continuing activity.  In Medallion,

8  the Ninth Circuit held that plaintiff, an entity which had entered

9  into a joint venture with defendant to acquire and exploit

10  television broadcasting rights to a boxing match, could not allege

11  a pattern of racketeering activity based on defendant's

12  misrepresentations about the number of licensing agreements it had

13  obtained.  833 F.2d at 1363-64.  The Ninth Circuit stated that

14  "Medallion's allegations concern a single fraudulent inducement to

15  enter a contract.  Once the joint venture had acquired the

16  broadcast rights, the fraud, if indeed it was a fraud, was complete

17  . . . Medallion was the single victim of the alleged fraud."  Id.

18  Similarly, here, the acts in furtherance of the alleged fraud in

19  the Bretz transaction were complete when Plaintiff loaned the

20  $270,000 to the non-party borrowers, and the acts in furtherance of

21  the alleged fraud in the Roem transaction were complete when

22  Plaintiff's $930,000 was removed from the escrow account.  In both

23  cases, Plaintiff was the single victim of the alleged fraud.  As

24  Plaintiff has not alleged "past conduct that by its nature projects

25  into the future with a threat of repetition," H.J. Inc., 492 U.S.

26  at 242, Plaintiff has not alleged that the Miller Defendants

27  engaged in a pattern of racketeering activity.

28

**United States District Court**
For the Northern District of California

1    In response, Plaintiff points to the following allegation:

2    "Defendants continue to engage in fraudulent acts and policies with

3    respect to the lending of money to borrowers.  Insofar as these

4    Defendants continue to participate in the business of lending money

5    to borrowers, their criminal conduct is specifically threatened to

6    be repeated or to extend indefinitely into the future."  SAC ¶ 68.

7    This statement is a mere legal conclusion, unsupported by factual

8    allegations, and the Court does not accept its truth.  See Iqbal,

9    129 S.Ct. at 1949 (2009).

10    Plaintiff also contends that the fraud associated with the

11    Roem transaction continues to this day because Defendants receive

12    regular loan repayments from Roem, and they have failed to deliver

13    any portion of that money to Plaintiff.  Opp'n to Miller MTD at 5-

14    6; Opp'n to Loanvest MTD at 5.  However, "the fact that Defendants

15    continue to reap the benefits of their alleged illegal activity

16    and/or that . . . [Plaintiff] continues to suffer the effects

17    thereof, is of no import to the Court's 'continuity'

18    determination."  Streamcast Networks, Inc. v. Skype Techs., S.A.,

19    No. 06-391, 2006 U.S. Dist. LEXIS 97392, at *22 (C.D. Cal. Sept.

20    14, 2006); see also Pier Connection v. Lakhani, 907 F. Supp. 72, 76

21    (S.D.N.Y. 1995) (recognizing that defendants' "continuing to reap

22    such benefits [of a fraudulent scheme] is not itself a predicate

23    act; it is only an effect of the alleged acts . . . .").  Having

24    failed to allege a pattern of racketeering activity, the Court

25    GRANTS the Miller Defendants' motion to dismiss the RICO claim

26    against them.

27    It is clear to the Court that Plaintiff's RICO claim cannot be

28    saved by amendment.  The Court's discretion to dismiss a claim

**United States District Court**
For the Northern District of California

without leave to amend is particularly broad where the plaintiff has previously filed an amended complaint.  <u>Miller v. Yokohama Tire Corp.</u>, 358 F.3d 616, 622 (9th Cir. 2004).  Here, the complaint has been amended twice, and Plaintiff's alleged injury is exclusively focused on the loss of money it provided in the Bretz transaction and the Roem transaction.  <u>See</u> SAC ¶¶ 17-42.  The alleged fraud associated with these transactions is complete, and there are no allegations that Plaintiff entered into any other transactions with the Miller Defendants and/or the Loanvest Defendants.  Therefore, the Court dismisses the RICO claim WITHOUT LEAVE TO AMEND.

> **D.    <u>California's Business and Professions Code, Breach of Fiduciary Duty, and Claim for Money Had and Received</u>**

Plaintiffs' fourth cause of action alleges that the Miller Defendants and the Loanvest Defendants violated California's Business and Professions Code.  SAC ¶¶ 70-76.  The fifth cause of action alleges that the Miller Defendants breached their fiduciary duty to Plaintiff, <u>id.</u> ¶¶ 77-80, and the sixth cause of action is a claim for money had and received against the Miller Defendants and the Loanvest Defendants, <u>id.</u> ¶¶ 81-84.

The Miller Defendants contend these three causes of action should fail because Plaintiff's fraud claim fails.  Miller MTD at 9.  Similarly, the Loanvest Defendants contend that the fourth and sixth causes of action fail because Plaintiff's fraud claim fails.  Loanvest MTD at 9.  The Court has denied the motions to dismiss Plaintiff's fraud claim, <u>see</u> Part IV.A, <u>supra</u>, and hence the Court must also DENY the Miller Defendants' request to dismiss Plaintiff's fourth, fifth and sixth causes of action, and the

**United States District Court**
For the Northern District of California

1    Loanvest Defendants' request to dismiss the fourth and sixth causes

2    of action.

3         Furthermore, an action for money had and received aims to

4    recover money paid on a contract whose consideration has failed,

5    <u>Bank of Am. Nat'l Turst and Saving Ass'n v. Hayden</u>, 231 F.2d 595,

6    601 (9th Cir. 1956).  As explained below, <u>see</u> Part IV.E, Plaintiff

7    adequately states a claim for breach of contract, and therefore the

8    Court finds that the claim for money had and received remains

9    viable at this early stage of the proceedings.

10        **E.    Breach of Written and/or Oral Contract and Implied**

11             **Covenant of Good Faith**

12        Plaintiff's seventh and eighth causes of action allege that

13   Miller, Sentinel, Cresson, and Loanvest breached a written and/or

14   oral contract with Plaintiff.  SAC ¶¶ 85-98.  "A cause of action

15   for breach of contract is comprised of the following elements: (1)

16   the contract, (2) plaintiff's performance or excuse for

17   nonperformance, (3) defendant's breach, and (4) the resulting

18   damages to plaintiff."  <u>Careau & Co. v. Sec. Pac. Bus. Credit,</u>

19   <u>Inc.</u>, 272 Cal. Rptr. 387, 395 (Ct. App. 1990).

20        The SAC alleges as follows:

21        On or about October 19, 2009, Defendant MILLER, on behalf
          of himself and LOANVEST XIII and his and its alter egos,
22        made the written offer set forth in his e-mail of that
          date.   The terms of the written offer were that in
23        exchange for CONCORDE'S delivery of money into an escrow
          account . . . these Defendants and each of them would pay
24        CONCORDE 17% return on the money delivered, plus 4 points
          at close.  Additionally, each of the Defendants agreed
25        that although the loan document reflected only Loanvest
          as the lender, CONCORDE would "go direct on title" for
26        its pro-rata share of the ROEM loan by way of assignment
          at close of the loan.  The offer confirmed that each of
27        these Defendants would provide title insurance for
          CONCORDE's position when the loan closed.

28

                                   15

SAC ¶ 86.  Plaintiff alleges this offer was made in relation to a $4 million loan, but the amount was later modified by mutual agreement and confirmed in writing.  Id. ¶ 87.  Plaintiff alleges it accepted the offer, wired $930,000 into the escrow account, but that Miller, Sentinel, Cresson, and Loanvest failed to perform their obligations by "failing to ensure that CONCORDE's interest in the loan was properly documented, failing to ensure that CONCORDE's interest was placed directly on title, failure to ensure that CONCORDE received title insurance at close of the loan, and failure to deliver any form of written confirmation of CONCORDE's position in the completed ROEM transaction." Id. ¶¶ 88-89.

These allegations are clearly sufficient to state a claim for breach of contract against the Miller Defendants.  It is alleged that the October 19, 2009 email set forth specific contract terms, and that Plaintiff accepted the offer and performed under the contract by wiring the money into the escrow account.  Id. ¶¶ 86-88.  It is alleged that the Miller Defendants breached the contract by not living up to its terms, and that Plaintiff has been harmed as a result.  Id. ¶¶ 89-91.  As such, the Court DENIES the Miller Defendants' motion to dismiss Plaintiff's seventh and eighth causes of action.

Whether these allegations are sufficient to state claims for breach of written and oral contract against Cresson and Loanvest is a closer call.  Plaintiff's claim for breach of written contract is based on an October 19, 2009 email sent from Miller to Fitzgerald.  See SAC ¶¶ 27, 86.  Plaintiff ties this claim to Cresson and Loanvest by alleging that Miller was acting "on behalf of himself

and LOANVEST XIII and his and its alter egos."  <u>Id.</u> ¶ 86.
Plaintiff alleges that both Miller and Cresson are the alter egos
of Loanvest, <u>id.</u> ¶ 11.  Based on these allegations concerning the
relationship between Miller, Cresson, and Loanvest, the Court finds
it is premature to dismiss Plaintiff's claim for breach of written
contract against Cresson and Loanvest.

The SAC also alleges that Cresson engaged in telephone
conversations with Plaintiff concerning the terms of Plaintiff's
participation in the Roem loan. <u>Id.</u> ¶ 23.  This factual allegation,
coupled with the allegation that Loanvest and Cresson are one and
the same, supports Plaintiff's claim for breach of oral contract
against Cresson and Loanvest.  If discovery reveals that the nature
of the relationship between Miller, Cresson, and Loanvest is other
than as alleged, then the Court can revisit the question of whether
Cresson and Loanvest breached a written and/or oral contract with
Plaintiff at a later stage of these proceedings.  The Court DENIES
the Loanvest Defendants' motion to dismiss the seventh and eighth
causes of action.

As the SAC states a claim for breach of written and/or oral
contract against the Loanvest Defendants, the Court also DENIES
their request for the Court to dismiss Plaintiff's ninth cause of
action for breach of the implied covenant of good faith and fair
dealing.  This is also an issue that the Court can revisit once the
parties have had an opportunity to conduct discovery.

### F.   <u>Unjust Enrichment/Quasi-Contract</u>

The Miller Defendants contend that Plaintiff's claim for
unjust enrichment is a remedy, and as such, the tenth cause of
action should be dismissed.  Miller MTD at 10.  There is a split of

**United States District Court**
For the Northern District of California

1    authority in California as to whether a claim for unjust enrichment

2    is recognized as an independent cause of action.  Some courts have

3    affirmatively stated that "unjust enrichment is not a cause of

4    action."  Jogani v. Super. Ct., 165 Cal. App. 4th 901, 911 (Ct.

5    App. 2008) (citing Melchior v. New Line Prods., Inc., 106 Cal. App.

6    4th 779, 793 (Ct. App. 2003)). Other courts allow an independent

7    claim of unjust enrichment.  See, e.g., Lectodryer v. Seoulbank, 77

8    Cal. App. 4th 723, 726 (Ct. App. 2000) (to state claim for unjust

9    enrichment, Plaintiff must plead "receipt of a benefit and the

10   unjust retention of the benefit at the expense of another.")

11   However, California courts agree that "unjust enrichment" is an

12   effect, "the result of a failure to make restitution under

13   circumstances where it is equitable to do so."  Melchior, 106 Cal.

14   App. 4th at 793; see also McBride v. Boughton, 123 Cal. App. 4th

15   379, 388 (Ct. App. 2004) (construing purported cause of action for

16   unjust enrichment as attempt to plead cause of action giving rise

17   to right to restitution).

18        Here, Plaintiff's tenth cause of action is labeled "Quasi-

19   Contract," and Plaintiff alleges that the Miller Defendants and the

20   Loanvest Defendants are benefiting from money that Plaintiff placed

21   in escrow because they used that money to fund a loan but, contrary

22   to their representations to Plaintiff, they have denied Plaintiff

23   any participatory interest in that loan.  SAC ¶¶ 22-42, 105-07.

24   Under these circumstances, Plaintiff is entitled to seek

25   restitution of its money, and hence the Court will not dismiss

26   Plaintiff's quasi-contract claim.

27        The Loanvest Defendants' only argument against the tenth cause

28   of action is that an unjust enrichment claim must fail if the

**United States District Court**
For the Northern District of California

1    underlying fraud claim fails.  Loanvest MTD at 9.  Having denied

2    the motions to dismiss Plaintiff's fraud claim, <u>see</u> Part IV.A,

3    <u>supra</u>, the Court is not persuaded by this argument.

4        **G.    <u>Resulting Trust</u>**

5        Plaintiff's twelfth cause of action is entitled "Resulting

6    Trust."  Both the Miller Defendants and the Loanvest Defendants

7    contend that a resulting trust is a remedy, not a cause of action.

8    Miller MTD at 10; Loanvest MTD at 11.  While the court in

9    <u>Stansfield v. Starkey</u> stated that a resulting trust as a remedy,

10   not a cause of action, 220 Cal. App. 3d 59, 76 (Ct. App. 1990),

11   other California courts have entertained causes of action that seek

12   to impose a resulting trust.  <u>See</u>, <u>e.g.</u>, <u>Fidelity Nat'l Title Ins.</u>

13   <u>Co. v. Schroeder</u>, 179 Cal. App. 4th 834, 850 (Ct. App. 2009)

14   (allowing judgment creditor to maintain resulting trust cause of

15   action).  "A resulting trust arises by operation of law from a

16   transfer of property under circumstances showing that the

17   transferee was not intended to take the beneficial interest."

18   <u>Lloyds Bank California v. Wells Fargo Bank</u>, 187 Cal. App. 3d 1038,

19   1042 (Ct. App. 1986).  Whether labeled as a cause of action, or a

20   remedy, the Court's focus is the gravamen of Plaintiff's complaint

21   based on the alleged facts.  If the Miller Defendants and the

22   Loanvest Defendants took Plaintiff's money out of the escrow

23   account and used that money to fund a loan from Loanvest to Roem,

24   then Plaintiff may have an equitable or beneficial interest in the

25   property used to secure that loan.  The Court DENIES the request to

26   dismiss Plaintiff's twelfth cause of action.

27       **H.    <u>Quia Timet</u>**

28       Plaintiff's fifteenth cause of action is labeled "Quia Timet."

**United States District Court**
For the Northern District of California

1   "Quia timet (literal translation, 'because he fears'), is an action

2   for equitable relief against an anticipated injury." <u>Escrow</u>

3   <u>Agents' Fidelity Corp. v. Super. Ct.</u>, 4 Cal. App. 4th 491, 494 (Ct.

4   App. 1992).  Bills quia timet are ordinarily applied to prevent

5   anticipated mischief, not to redress wrongs after they have

6   occurred.  <u>Id.</u>  Bills quia timet are most often filed in surety

7   cases, where a surety, after the debt for which he is liable has

8   become due, seeks to compel the principal to pay the debt.  <u>Id.</u>

9        In this case, the Court has already denied Plaintiff's request

10  for injunctive relief seeking to compel Defendants to cooperate

11  with a receiver.  <u>See</u> Docket No. 39 ("June 9, 2010 Order").

12  Plaintiff primarily seeks redress for alleged wrongs that have

13  already occurred associated with the Bretz transaction and the Roem

14  transaction.  The allegations in this case do not support

15  Plaintiff's statement that it "has no adequate remedy at law for

16  the injury that would be caused by the defendants' sale of their

17  beneficial interests in the ROEM Transaction." SAC ¶ 133.  As

18  noted in the Court's previous order, there is nothing to suggest

19  that any of the Defendants in this case are of doubtful financial

20  standing, and nothing to suggest that Defendants would not be able

21  to satisfy a monetary judgment against them.  June 9, 2010 Order at

22  5-7.  Because Plaintiff seeks the return of its money, the Court

23  DISMISSES Plaintiff's quia timet cause of action WITHOUT LEAVE TO

24  AMEND.

25  **I.   <u>Declaratory Relief</u>**

26       Plaintiff's eleventh cause of action seeks a judicial

27  determination of the rights and liabilities of the parties with

28  regard to the Roem transaction.  SAC ¶¶ 108-111.  This cause of

20

action is ultimately a request for relief.  <u>Weiner v. Klais and</u>
<u>Co., Inc.</u>, 108 F.3d 86, 92 (6th Cir. 1997).  Declaratory relief may
be unnecessary where an adequate remedy exists under some other
cause of action.  <u>Mangindin v. Wash. Mut. Bank</u>, 637 F. Supp. 2d
700, 707 (N.D. Cal. 2009).  Likewise, "[d]eclaratory relief should
be denied when it will neither serve a useful purpose in clarifying
and settling the legal relations in issue nor terminate the
proceedings and afford relief from the uncertainty and controversy
faced by the parties." <u>United States v. Washington</u>, 759 F.2d 1353,
1356-57 (9th Cir. 1985) (en banc) (per curiam) (citations omitted).

     In the present case, Plaintiff's request for declaratory
relief is redundant and duplicative of Plaintiff's other claims.
Plaintiff's request is identical to the relief sought in the other
viable causes of action, and the resolution of those causes of
action would afford Plaintiff the exact relief sought in the cause
of action for declaratory relief.  Accordingly, the Court DISMISSES
the eleventh cause of action for declaratory relief WITHOUT LEAVE
TO AMEND.

**V.    CONCLUSION**

     For the reasons stated above, the Court GRANTS IN PART and
DENIES IN PART the motions to dismiss filed by Defendants Kenneth
Alfred Miller, Sentinel Investment Management Company, Loanvest
XIII, L.P., South Bay Real Estate Commerce Group, Peter Scott
Carter, Jr., and George Cresson.  The Court DISMISSES WITH
PREJUDICE Plaintiff's claim that there was a violation of the
Racketeer Influenced and Corrupt Organization Act.  The Court
DISMISSES WITH PREJUDICE Plaintiff's claims for declaratory relief

and quia timet.  In all other respects, the Court DENIES the

motions to dismiss filed by Kenneth Alfred Miller, Sentinel

Investment Management Company, Loanvest XIII, L.P., South Bay Real

Estate Commerce Group, Peter Scott Carter, Jr., and George Cresson.


     IT IS SO ORDERED.


     Dated:  August 10, 2010          
                                    _____
                                    UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

22